**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

———————————————————————

**LILLIAN MILLER, Individually and**
**As Administratrix of the**
**ESTATE OF EDWARD E. MILLER,**
**Deceased,**

|   |   |   |
|---|---|---|
| | **Plaintiff,** | **3:08-CV-00382** |
| **v.** | | |

**WILSON MEMORIAL REGIONAL**
**MEDICAL CENTER, MICHAEL**
**ARONIS, M.D., THEODORE M.**
**PETKOV, M.D., and UNITED HEALTH**
**SERVICES Inc.,**

                                              **Defendants.**

———————————————————————

**THOMAS J. McAVOY,**
**Senior United States District Judge**


**DECISION & ORDER**

**I.      INTRODUCTION**

Plaintiff commenced this action on April 8, 2008 against Michael Aronis, MD,

Theodore M. Petkov, MD, Wilson Memorial Regional Medical Center, and United

Health Services asserting negligence in their care and treatment of the deceased, Edward

E. Miller. The thrust of Plaintiff's claims is that Mr. Miller's care providers failed to order a

Computerized Tomography ("CT") scan of his head and neck afer Mr. Miller was injured in

a rollover motor vehicle accident, which scan purportedly would have revealed multiple

cerebral infarcts and a fracture of the C-3 transverse foramen. Plaintiff asserts that Mr.

Miller's death was caused because these injuries were left undiagnosed.

Defendants United Health Services Hospitals Inc. and Wilson Memorial Regional Medical Center ("Defendants")[1] have moved for partial summary judgment seeking to dismiss the claims asserting: (1) negligence on the part of Wilson Memorial Regional Medical Center for granting privileges to Dr. Petkov and Dr. Aronis; and (2) negligence on the part of Wilson Memorial Regional Medical Center for the conduct of its employee nurses.   Plaintiff has conceded the first prong of the motion, see Plt. Mem. L., p. 12,[2] but has  opposed the second prong. See id.  For the reasons that follow, the second prong of the motion is denied.

## II.    STANDARD OF REVIEW

It is well settled that on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the non-moving party, see Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999), and may grant summary judgment only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56( c).  An issue is genuine if the relevant evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).  A party seeking summary judgment

---

[1] Defendants note that although Wilson Memorial Regional Medical Center is named as a separate defendant in the action, it is not a separate corporate entity, but a facility operated by defendant United Health Services Hospitals Inc.

[2] ("Plaintiff maintains her position, as set forth in the expert report of Arthur A. Klein, MD, that Drs. Aronis and Petkov each acted in an incompetent manner in providing care to the deceased. Plaintiff concedes, however, that nothing has been confirmed though discovery which would support the position that Drs. Petkov and Aronis did not have the appropriate credentials in terms of medical school education and board certifications to maintain a position on the emergency room staff, and Plaintiff will therefore stipulate to partial summary judgment on that very narrow issue.")

bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of a genuine issue of material fact as to a dispositive issue.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in her favor.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A party opposing a properly supported motion for summary judgment may not rest upon "mere allegations or denials" asserted in his pleadings, Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525-26 (2d Cir. 1994), or on conclusory allegations or unsubstantiated speculation.  Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998).

## III.    BACKGROUND

Edward E. Miller ("Miller") was involved in a tractor trailer roll-over motor vehicle accident at about 2:30 A.M. on January 8, 2007.  Emergency medical services responded to the scene. The emergency medical services personnel's notes indicated that, at the scene of the accident, Miller was responsive and had lacerations to the left side of his head, pain in his ribs and left shoulder, lacerations on the right side of his head, and pain with swelling on the left side of his neck.  Emergency medical services personnel placed a cervical collar ("C-collar") on Miller, placed him on a backboard, and transported him by ambulance to Wilson Memorial Regional Medical Center

At approximately 3:44 A.M., Miller was seen in the emergency room by Nurse Jacobs for the initial triage assessment.  Nurse Jacobs noted that Miller was involved in a

tractor trailer roll-over motor vehicle accident and that his injuries included right side rib pain with movement, left shoulder pain, and right sided head laceration. Nurse Jacobs noted no loss of consciousness, no headache, neck pain, back pain, numbness or weakness.

Miller was seen by Dr. Petkov at 6:07 A.M.  Dr. Petkov removed Miller's cervical collar ("C-collar") and backboard at 6:10 A.M.  Dr. Petkov testified at his deposition that Miller was irate and that the C-collar was removed because Miler claimed he was going to remove it himself.  The nursing progress notes include no mention of the rationale for the removal of the C-collar.

When seen by Dr. Petkov, Miller complained of injuries to the face, chest and shoulder and of moderate pain.  Dr. Petkov noted that Miller had sustained a blow to the head but that there was no neck pain, loss of consciousness or seizure.  However, Dr. Petkov noted that Miller had numbness on the left side of his neck and left shoulder area and complained of severe, sharp, stabbing, pleuritic right-sided chest pain.  Although not noted in the medical record, Dr. Petkov testified at his deposition that he did recall some tenderness on the left side of the neck, but that he did not believe it was significant.

Dr. Petkov ordered x-rays of the cervical spine ("c-spine") and left shoulder, which were read as "negative."  He also ordered x-rays of the chest, which revealed fractures of the 7th, 8th, 9th and 10th right ribs which diagnosis was confirmed by a chest CT.  The CT of the abdomen showed no acute disease.

Dr. Petkov requested a general surgical consult from Dr. Aronis with regard to trauma admission.  Dr. Aronis saw Miller at 11:30 A.M.   Dr. Aronis noted that Miller complained of right-sided chest pain and some numbness and tingling on the left side of

his neck, but with no motor function losses in his upper extremity.  Dr. Aronis also noted that Miller's neck was supple with normal range of motion and no bony abnormality, and that he had reviewed a CT scan of the head and neck which was otherwise benign.[3]  Dr. Aronis indicated that he does not recall being concerned that Miller had sustained an occult injury to his cervical spine because the C-collar had been removed and that an occult injury would have had to have been ruled out when the C-collar was removed.

Miller was moved to a room on a cardiac monitor and was placed on "hold status" in the ER.  An admission database was completed by Nurse Rose.  A notation was made on the assessment that Miller was experiencing a new onset of weakness.  There is no documentation that this information was communicated to the primary nurse or the physician.

Plaintiff Lilian Miller ("Lilian"), Miller's daughter, arrived at Wilson Hospital at noon on January 9, 2007 to visit her father.  Upon arrival, Miller advised Lillian that his left shoulder and left arm were numb and that he was having pain in the left side of his neck.  Miller told Lillian that "they said nothing's wrong."  Lillian observed Miller holding his neck, demonstrating that he was in pain.  Lilian asked the nurse for aspirin and advised the nurse that Miller was still having pain in his neck, arm and shoulder.

No CT scan of the head or C-spine was ordered for Miller.  He was discharged from Wilson  Memorial Regional Medical Center at 2:00 P.M. on January 9, 2007.  On January 10,

---

[3]Dr. Aronis indicated at his deposition that he would have been referring to the X-ray of the head and neck in his notes.

2007, Miller was found in his home by family members to be unarousable and minimally responsive.  Miller was taken to St. Luke's Hospital in Lehigh County, Pennsylvania where a CT scan of his head and neck showed multiple cerebral infarcts and a fracture of the C-3 transverse foramen.  Miller died at St. Luke's Hospital on January 16, 2007.  The cause of death as stated in the Lehigh County, Pennsylvania, Coroner's Report was blunt force injuries of neck and torso due to motor vehicle accident.

Plaintiff retained the services of Theresa T. Acker-DiGuardi, RN, CLNC, to provide an opinion on the actions and omissions of the nursing staff at Wilson Memorial Regional Medical Center.   Acker-DiGuardi opines that there were deviations from the standard of care and that the nursing staff failed to adhere to Defendant United Health Services' policy and the Emergency Severity Index (ESI) Triage system.  In this regard, Acker-DiGuardi asserts that nurses are required to rate patient acuity level in high risk situations, such as rollover motor vehicle crashes with obvious head injuries in immobilized patients, at level 2 and procure immediate assessment by a physician. In addition, she asserts that the standard of care for nursing assessment of head injury patients includes a neurological assessment a minimum of every two hours unless ordered more frequently by a physician. The neurological assessment should include, but is not limited to, recording of pupil size and reactivity; level of consciousness; orientation and Glascow coma scale (GCS). Acker-DiGuardi contends that the nurses failed to adhere to nursing standards and United Health Services' policy by not documenting a neurological assessment on Miller until nearly 18 hours afer the baseline assessment, and then only one additional time prior to discharge the following day.

In addition, Acker-DiGuardi notes that United Health Services' policy requires pain

assessments a minimum of every two hours, which assessments should include documentation as to a description of the pain, duration, location, and characteristic of pain. She notes that pain medication was given to Miller during the course of his hospitalization but without documentation of pain assessment as to location, description and characteristic. She further notes that when Miller was placed on hold status in the ER, an assessment was completed by Nurse Rose who noted that Miller was experiencing a new onset of weakness, yet there was no documentation that this was communicated to the primary nurse or physician, and there is no documentation as to the location of the weakness.

Acker-DiGuardi opines that the failure to document and timely report the abnormal assessment findings or change in Miller's condition were deviations from acceptable standards of care and from United Health Services' policy. She further opines that, had the nurses acted in conformity with acceptable standards of nursing care, their actions would have prompted further evaluation and treatment by the physicians.

## IV.   DISCUSSION

Defendants contend that it is the responsibility of the emergency room physician, attending physician or consulting physician, rather than the nursing staff, to diagnose a cervical spine injury and to determine whether a CT scan of the spine and neck were necessary to diagnose such an injury. Defendants further contend that:

> There is no basis in the record to indicate that the nursing deviations alleged by Nurse Acker-DiGuardi, were a contributing cause of the plaintiff's injuries. [P]laintiff claims that plaintiff's decedent's death was caused by the failure of Dr. Petkov and Dr. Aronis to diagnose his C-3 fracture. In particular, plaintiff argues that based on the plaintiff's history and presentation the doctors should have ordered a CT scan of the neck and head which would have revealed the fracture.

> However, there is no basis for a jury to find that at CT scan of the neck would have been ordered or such a fracture would have been diagnosed had the nurses provided a more detailed and frequent pain assessment, or more frequent physical assessments. . . . As such, the plaintiff cannot raise an issue of fact as to a causal connection between the alleged negligence of the nurses and the inability of Dr. Petkov and Dr. Aronis to diagnose the plaintiff's C-3 fracture.

Def. Mem. L. pp. 7-8.

To the extent that Defendants' motion is based on the premise that there exists no factual basis upon which a jury could find a causal connection between the asserted - deviations of the nurses from the standard of care and the failure of the treating and consulting physicians to diagnose Miller's C-3 fracture, the motion must be denied. Viewing the evidence in the light most favorable to the non-movant, and drawing reasonable inferences in Defendants' favor, a jury could conclude that nursing staff omissions contributed in some way to the physicians' failure to diagnose Miller's C-3 fracture.  It remains a question of fact as to whether the nurses' failure to include in the medical record such information as the reasons for removal of the C-collar; the new onset of weakness while in the emergency room; and the patient's continued pain and numbness in the left shoulder, arm and side of his neck would have prompted the physicians to order a CT scan of the spine and neck.  It also remains a question of fact as to whether the nursing staff followed the appropriate standard of care in treating Miller and whether the hospital provided competent personnel or promulgated appropriate emergency room rules.

Under these circumstances, Plaintiff could prevail on a claim of medical malpractice against the hospital defendants.  See Coursen v. New York Hosp.-Cornell Med. Ctr., 114 A.D.2d 254, 256 (1986)("An action to recover for personal injuries or wrongful death

8

against a medical practitioner or a medical facility or hospital may be based either on

negligence principles or on the more particularized medical malpractice standard."); 

Staveley v. St. Charles Hosp., 173 F.R.D. 49, 52 (E.D.N.Y. 1997)("It is well settled that

'[c]onduct may be deemed malpractice, rather than negligence when it constitutes medical

treatment or bears a substantial relationship to the rendition of medical treatment by a

licensed physician.'")(quoting Scott v. Uljanov, 74 N.Y.2d 673, 674-75 (1989)); see also

Bleiler v. Bodnar, 65 N.Y.2d 65, 66 (1985)("A claim against a hospital for the negligence of

its medical personnel in treating a patient is governed by the Statute of Limitations for

medical malpractice, as is a direct cause of action against the doctor and the nurse.

However, a claim that the hospital failed to provide competent personnel or to promulgate

appropriate emergency room rules sounds in negligence, and is subject to the three-year

limitations period (CPLR 214), rather than the shorter medical malpractice limitations

period (CPLR 214-a)."); Friedmann v. New York Hospital-Cornell Medical Center, 65

A.D.3d 850, (1st Dept. 2009)(Catterson, J., dissenting)("[I]t is well settled that malpractice

actions may 'apply to acts and omissions committed by individuals and entities other than

physicians where those acts and omissions either constitute medical treatment or bear a

substantial relationship to the rendition of medical treatment.'")(quoting Karasek v. LaJoie,

92 N.Y.2d 171, 174-175 (1998)).

While Nurse Acker-DiGuardi may not be competent to testify as to the standard of

care of a physician, it is presumed that, because there is no motion to dismiss the claims

against Drs. Petkov and Aronis, Plaintiff will be able to establish a medically sufficient

causal connection between the failure to diagnose Miller's C-3 fracture and his death. See

Def. Ex. 42-8 (Statement of Arthur Klein, MD).  Acker-DiGuardi's proffered testimony

appears to be only a part of the proof in establishing a connection between the hospital

defendants' actions or omissions, either vicariously or directly, and Miller's death.

Whether the claim will be successful must be determined by a jury.

## V.     CONCLUSION

For the reasons set forth above, Defendants United Health Services Hospitals Inc.

and Wilson Memorial Regional Medical Center's motion [dkt. # 42] is **GRANTED IN PART**

**and DENIED IN PART**.   The motion is granted to the extent that any claim asserting

negligence on the part of Wilson Memorial Regional Medical Center for granting privileges

to Dr. Petkov and Dr.  Aronis is **DISMISSED**.  The motion is **denied in all other respects**.


**IT IS SO ORDERED**

DATED :January 25, 2010



Thomas J. McAvoy
Senior, U.S. District Judge